**CEDAR VALLEY CORPORATION,**
Appellant,

v.

**NATIONAL LABOR RELATIONS BOARD, Appellee.**

No. 91–2160.

United States Court of Appeals,
Eighth Circuit.

Submitted March 9, 1992.

Decided Aug. 26, 1992.

Rehearing and Rehearing En Banc Denied,
Nov. 27, 1992.

Kevin James Visser, Cedar Rapids, Iowa, argued (Kevin J. Visser, Robert E. Konchar and Mark J. Herzberger, on the brief), for appellant.

Robert Herman, Washington, D.C., argued (Charles Donnelly, Robert N. Herman, Jerry M. Hunter, D. Randall Frye and Aileen A. Armstrong, Washington, D.C., on the brief), for appellee.

Before, FAGG, Circuit Judge, BEAM, Circuit Judge, and GAITAN,* District Judge.

GAITAN, District Judge.

The focus of this appeal is a decision by the National Labor Relations Board (here-

---

after NLRB) adverse to petitioner, Cedar Valley Corporation (hereafter Cedar Valley). Citing *John Deklewa & Sons*, 282 N.L.R.B. 184 (1987), *enfd. sub nom.*, *Iron Workers Local 3 v. N.L.R.B.*, 843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), the NLRB rendered a Decision and Order holding that Cedar Valley violated Section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1988), by unilaterally repudiating Section 8(f) agreements with the charging labor unions before the agreements' expiration. Cedar Valley petitions for review of the NLRB's Decision and Order arguing that it is invalid and therefore enforcement should be denied.

## I. FACTUAL SUMMARY

Cedar Valley is a corporation headquartered in Waterloo, Iowa and is engaged in the business of road construction. During the 1970s and through 1982, Cedar Valley's employees were represented by four labor unions in the Waterloo area: Operating Engineers Local 234, Cement Masons Local 818, the Iowa Laborers' District Council, and Teamsters' Local 844. In October of 1984, the employees represented by Operating Engineers Local 234 and Iowa Laborers' District Council voted to terminate this representation through decertification of these unions. At approximately the same time, Cement Masons Local 818 and Teamsters' Local 844 disclaimed interest in representing Cedar Valley employees in Waterloo.

Cedar Valley's relationship with the complaining unions began in 1978 (during the pendency of the collective bargaining agreements with the Waterloo labor unions) when Cedar Valley was awarded a road construction contract near Davenport, Iowa. Also during 1978, agents for Cedar Valley signed collective bargaining agreements (hereafter Quad City Agreements) already in existence between Illinois con-

---

* The HONORABLE FERNANDO J. GAITAN, JR., United States District Court Judge for the West-

ern District of Missouri, sitting by designation.

struction unions in the Quad City area and a local multi-employer association of construction employers (hereafter Associated Contractors). Among the Illinois construction unions party to the Quad City Agreements signed by Cedar Valley were Laborers Local 309, Operating Engineers Local 537, Cement Masons 544, and Teamsters 371 (hereafter Complaining Unions). The complaining unions are labor organizations based in Rock Island, Illinois, with jurisdiction in Rock Island, Moline, and East Moline, Illinois, and Davenport, Iowa, and their environs, an area known as the "Quad Cities".

Pursuant to the Quad City Agreements signed by Cedar Valley in 1978, the 1978 project was completed using roughly one-half existing Cedar Valley employees and one-half locally referred workers. In 1981, Cedar Valley was awarded a second road construction contract in the Davenport area. Cedar Valley honored the Quad City Agreements signed in 1978 and again local workers comprised approximately one-half of the workforce.[1]

In 1985, Cedar Valley's bid on a third project in the Davenport area was accepted. To complete this project Cedar Valley used Cedar Valley employees to the exclusion of any employees from Laborers Local 309, Operating Engineers Local 537 or Cement Masons 544. However, before the project commenced a Teamsters' Business Agent confronted Cedar Valley about apparent violations of the Quad City Agreements signed in 1978. In response, Cedar Valley's Vice President stated that Cedar Valley had severed its relationship with the Teamsters in the previous two years. No action was taken against Cedar Valley by

the complaining unions as a result of its actions in the 1985 project.[2]

In April of 1989, Cedar Valley was awarded a 4.2 million dollar contract to pave eight miles of interstate highway near Davenport. Prior to, or immediately after, commencement of work on this project, three of the complaining unions (excluding Teamsters) approached Cedar Valley concerning "pre-job conferences" pursuant to the 1978 Quad City Agreements.[3] Cedar Valley refused to recognize the complaining unions and expressed its belief that it was no longer bound by the 1978 agreements. As a basis for this refusal, Cedar Valley cited the 1984 decertification proceedings by the Waterloo unions and the lack of contact between Cedar Valley and the complaining unions since 1981. The interstate highway project was completed without employees of the complaining unions. The complaining unions brought this action in an effort to enforce their rights under the 1978 Quad City Agreements.

## II. STANDARD OF REVIEW

 The appropriate standard of review is somewhat in dispute. The NLRB argues that, in light of this Court's acceptance of *Deklewa*, the issues presented by this appeal are primarily factual. "Thus, the Board's findings that the Company (Cedar Valley) was bound to current Section 8(f) pre-hire agreements with the Union in 1989 must be upheld if supported by substantial evidence." Respondent's Brief, p. 12 (citing *Universal Cameral Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). Cedar Valley argues that the proper standard of review is multifaceted and in addition to factual findings,

1. In 1981 Cedar Valley, through a corporate officer, signed the then current agreement between the Cement Masons 544 and Associated Contractors. This agreement was essentially identical to the 1978 agreement.

2. Despite the protest initially expressed by the Teamsters' agent, no action was taken against Cedar Valley by Teamsters: All drivers at the interstate construction site were represented by the Teamsters' Union 371 via a subcontractor who was a member of the multi-employer asso-

ciation of construction employers in the Quad City area.

3. The Teamsters' Union registered its objection to Cedar Valley's activities on the 1989 project after work had commenced. A Teamsters' representative went to the work site and presented copies of the collective bargaining agreements and a business card to a Cedar Valley agent. Cedar Valley did not reply to the Teamsters' as a result of this visit.

the NLRB's decision incorporated interpretation of the controlling statutes and contracts.[4]

In due consideration of these arguments, the Court finds the standard of review stated in *GSX Corp. of Missouri v. N.L.R.B.*, 918 F.2d 1351 (8th Cir.1990), controlling. "This court must enforce the Board's order if the Board has correctly applied the law and if its findings rest upon substantial evidence." *Id.* at 1356. This standard of review is controlling of all arguments presented by Cedar Valley except the argument concerning the Board's misinterpretation of the collective bargaining agreement between Teamsters' 371 and Associated Contractors. As to that argument, the Court will conduct a *de novo* review of any contract interpretation engaged in by the Board. *See Litton Fin. Printing v. N.L.R.B.*, —— U.S. ——, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991) (In finding that the Board's interpretation of a collective bargaining agreement should be reviewed without deference to the Board's finding, the Court held that "the Board is neither the sole nor the primary source of authority in such matters …").

Therefore, as to all findings except contract interpretation, the NLRB must be sustained if: (1) it started with the currently controlling law; (2) it correctly applied this law; and (3) substantial evidence supports its finding that Cedar Valley's actions violated Section 8(a)(1) and (5) of the National Labor Relations Act.

**III. ANALYSIS**

There is no dispute that the NLRB's interpretation of Section 8(f) in *John Deklewa & Sons*, 282 N.L.R.B. 184 (1987), enfd. sub nom., *Iron Workers Local 3 v. N.L.R.B.*, 843 F.2d 770 (3d Cir.1988), governs this action. *Deklewa* has recently been adopted by this Court as the proper and controlling interpretation of Section 8(f). *N.L.R.B. v. W.L. Miller Co.*, 871 F.2d 745, 747–48 (8th Cir.1989). In *Deklewa*, the NLRB broke from the previous interpretation of Section 8(f) as stated in *R.J. Smith Constr. Co.*, 191 N.L.R.B. 693 (1971), enf. denied sub nom., *Operating Engineers Local 150 v. N.L.R.B.*, 480 F.2d 1186 (D.C.Cir.1973), overruled by *N.L.R.B. v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), and held that "pre-hire" agreements made pursuant to Section 8(f) are "binding, enforceable, and not subject to unilateral repudiation" throughout their term. *Deklewa*, 282 N.L.R.B. 184, at 1389 & n. 62. This conclusion was derived from four interpretive principles stated by the Board:

> We shall apply the following principles in 8(f) cases: (1) a collective bargaining agreement permitted by Section 8(f) shall be enforceable through the mechanisms of Section 8(a)(5) and Section 8(b)(3); (2) such agreements will not bar the processing of valid petitions filed pursuant to Section 9(c) and Section 9(e); (3) in processing such petitions, the appropriate unit normally will be the single em-

---

**4.** In its Reply Brief, Cedar Valley acknowledges that the "substantial evidence test" must control as to the factual findings made by the NLRB. However, Cedar Valley argues that this court should review the NLRB's factual findings more critically than normal under the substantial evidence test because the ALJ failed to make essential factual findings and "the Board is in no better position to make findings of fact than is this Court." Cedar Valley's Reply Brief, p. 3 (citing *GSX Corp. of Missouri v. N.L.R.B.*, 918 F.2d 1351 (8th Cir.1990).

Cedar Valley also argues that "the appeal is not based upon claims of erroneous fact findings." Rather, "Cedar Valley urges that the Board has misapplied its own interpretation of Section 8(f), and that it has misinterpreted the so-called collective bargaining agreements en-

tered into in 1978." Cedar Valley's Reply Brief, p. 4. Accordingly, Cedar Valley argues that (1) the NLRB's statutory interpretation and/or application should be reversed if "plainly erroneous or inconsistent with … the *Deklewa* principles." *Id.* at 3 (citing *First National Bank in Sioux Falls v. National Bank of South Dakota*, 667 F.2d 708 (8th Cir.1981)); and (2) the NLRB's interpretation of the underlying contracts should be reviewed *de novo*. Cedar Valley's Reply Brief, p. 3 (citing *Litton Fin. Printing v. N.L.R.B.*, —— U.S. ——, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991)).

The court finds *Litton Fin. Printing* controlling as to contract interpretation. However, the court disagrees that the Board or ALJ engaged in statutory interpretation and refuses to review the Board's decision within that context.

ployer's employees covered by the agreement; and (4) upon the expiration of such agreements, the signatory union will enjoy no presumption of majority status, and either party may repudiate the 8(f) bargaining relationship.

*Deklewa*, 282 N.L.R.B. 184 at 1377–78. The Board went on to further expand these principles within the context of effectuating the organic statute.

Taken together, the four basic principles we advance today provide an overall framework for the interpretation and application of Section 8(f) which will enable parties to 8(f) agreements and employees to know their respective rights, privileges, and obligations at all stages in their relationship. When parties enter into an 8(f) agreement, they will be required, by virtue of Section 8(a)(5) and Section 8(b)(3), to comply with that agreement unless the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative. Neither employers nor unions who are party to 8(f) agreements will be free unilaterally to repudiate such agreements. During its term, an 8(f) contract will not act as a bar to petitions pursuant to Section 9(c) or (e). In determining the appropriate unit for election purposes the Board will no longer distinguish between "permanent and stable" and "project by project" work forces, and single employer units will normally be appropriate. In the event of an election, a vote in favor of the signatory union, or a rival union, will result in that union's certification and the full panoply of Section 9 rights and obligations. A vote to reject the signatory union will void the 8(f) agreement and will terminate the 8(f) relationship ... Even absent an election, upon the contract's expiration, the signatory union will enjoy no majority presumption and either party may repudiate the 8(f) relationship.

*Deklewa*, 282 N.L.R.B. 184 at 1385.

■ Arguing from the principles stated in *Deklewa*, Cedar Valley attacks the validity of the NLRB's Decision and Order from a variety of angles. Cedar Valley alleges that: (1) The decertification of the Waterloo labor unions in 1982 acted to terminate the Quad City Agreements between Cedar Valley and the complaining unions; (2) The Section 8(f) Quad City Agreements of 1978 expired prior to 1982 and thus, under *Deklewa*, the complaining unions enjoyed no presumption of majority and the agreements were unenforceable; (3) Even if this Court finds that *Deklewa* was properly applied to the facts of this action, retroactive application is manifestly unjust; (4) The alleged disintegration of Associated Contractors frustrated the 1978 Quad City Agreements; and (5) The Board misinterpreted the Local 371 contract.[5]

---

5. Cedar Valley also argues that (1) it formally repudiated the 1978 Quad City Agreements with Laborers Local 309, Operating Engineers Local 537 and Teamsters 371 prior to the 1989 successor agreements; and (2) Cedar Valley's 1985 conduct repudiated the 1978 agreements. The court finds that these arguments lack merit.

First, the record is devoid of any facts supporting a conclusion that Cedar Valley formally terminated the 1978 agreements, by the method prescribed by the agreements, prior to the 1989 agreements. Additionally, Cedar Valley has not even alleged or argued facts supporting the existence of the required formal repudiation. Instead, Cedar Valley relies on the argument that it repudiated the agreements in a time "gap" between the April 30, 1989, expiration and the effective date of successor agreements. This time "gap" argument is only effective as to Laborers 309 and Operating Engineers 537: Both the 1978 agreement between Teamsters' 371 and Associated Contractors and the 1981 agreement between Cement Masons 544 and Associated

Contractors renewed automatically and were not dependent on successor agreements entered into by Associated Contractors. As to Laborers 309 and Operating Engineers 537, the Board concluded that "[t]he record shows, however, that there was, in fact, no 'gap.'" Based upon testimony from officers of Operating Engineers 537 and Laborers 309, the NLRB concluded that "new agreements were effective on the April 30, 1989, expiration of the old contracts...." Accordingly, Cedar Valley's claim that it formally repudiated the controlling agreements is without merit.

Second, Cedar Valley's "repudiation by conduct" is not well founded: *Deklewa* firmly establishes that a party to a Section 8(f) agreement cannot unilaterally repudiate a pre-hire agreement. The only authority cited by Cedar Valley in support of this argument predates *Deklewa*. In light of *Deklewa* this court refuses to accept the "repudiation by conduct" argument. To hold that a single party can repudiate

This Court finds that Cedar Valley has failed to show that the Board applied the wrong law (or the right law incorrectly) or that its decision is not supported by substantial evidence. Accordingly, we are compelled by the applicable standard of review to affirm and enforce the Decision and Order of the NLRB.

### A. DECERTIFICATION BY THE WATERLOO UNIONS

■ In October of 1984, Waterloo employees of Cedar Valley voted to decertify the Waterloo labor organizations of Operating Engineers Local 234 and Iowa Laborers' District Council as their representatives. At approximately the same time, the Cement Masons Local 818 and Teamsters' Local 844 disclaimed any desire to further represent Cedar Valley employees. Cedar Valley concludes that "the 1983–1984 decertification activity extinguished the rights of Davenport unions (the complaining unions) under their 1978 pre-hire agreements ..." Petitioner's Brief, p. 18. The fundamental presumption underlying Cedar Valley's argument is that *all* Cedar Valley employees in a craft are represented by a single, exclusive bargaining representative.

The NLRB, through the ALJ, disagreed. "[T]he four Charging Party Unions were not parties or even notified about the Region 18 litigation regarding their sister locals ... A decertification of Union X does not decertify Union Y. If grounds exist to repudiate a contract with Union A or grounds exist to justify a refusal to bargain with Union A it does not follow that an employer may repudiate a contract with Union B or refuse to bargain with Union B." Decision of the ALJ, p. 14. In adopting the ALJ's argument, the NLRB clearly relies on a fundamental presumption contrary to Cedar Valley's: Not all Cedar Valley employees in a craft must be represented by one exclusive bargaining representative. Rather, employees in different geographical locations are represented by dif-

ferent bargaining representatives who, though exclusive as to employees in that area, are independent from exclusive representatives of employees in other places.

Cedar Valley relies on *Bentson Contracting Co. v. N.L.R.B.*, 941 F.2d 1262 (D.C.Cir.1991), which states that "[t]wo unions ... simply cannot be the exclusive bargaining representative of the same employee." *Id.* at 1266. The Court in *Bentson* reviewed the NLRB's decision to grant competing unions the right to represent "combination" employees who did work falling within the parameters of each craft. The Court rejected the NLRB's "combination" representation, holding that a single worker could not be represented by more than one representative. *Id.* at 1267. While this Court does not question the wisdom of *Bentson*, neither does it find it supportive of Cedar Valley's argument. The issue here is not whether a single employee can be represented by two bargaining representatives, but whether employees of one employer who are located in different geographical areas can have different exclusive representatives.

■ Section 9(a) of the National Labor Relations Act provides that "[r]epresentatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative of all the employees in such units...." 29 U.S.C. § 159(a) (1988). The statute charges the NLRB with determining whether a unit is appropriate for exclusive representation. 29 U.S.C. § 159(b) (1988). In making this determination, the "community of interests" analysis is used. *See Electronic Data Sys. Corp. v. N.L.R.B.*, 938 F.2d 570, 573 (5th Cir.1991). "Factors used to determine a 'community of interests' include 'bargaining history, operational integration, geographic proximity, common supervisor, similarity in job function, and employee interchange.'" *Id.* (quoting *N.L.R.B. v. Purnell's Pride, Inc.*, 609 F.2d 1153, 1156 (5th Cir.1980)). Fur-

a contract simply by acting in violation of the agreement would serve only to emasculate *Dek-*

*lewa.*

ther, while the Board should consider all the factors, "its discretion is not limited by a requirement that its judgment be supported by all, or even most, of the potentially relevant factors." *N.L.R.B. v. DMR Corp.*, 795 F.2d 472, 475 (5th Cir.1986) (quoting *International Ass'n of Machinists and Aerospace Workers v. N.L.R.B.*, 759 F.2d 1477, 1480 (9th Cir.1985)). Indeed, the NLRB's determination as to the appropriateness of a bargaining unit will rarely be disturbed and this Court's scope of review is narrow. *Electronic Data Sys. Corp. v. N.L.R.B.*, 938 F.2d 570, 572 (5th Cir.1991).

Through the ALJ, the NLRB implicitly held that the appropriate units for exclusive representation in this case were a function of crafts and geographical factors: That is, the Waterloo units of the Teamsters, Cement Masons, Operating Engineers and Laborers are distinct and independent from their sister units in the Quad City area. The Quad City agreements of 1978 clearly establish the geographical scope of the complaining unions' jurisdiction. Roughly stated, the broadest possible scope of jurisdiction under the 1978 agreements included Scott County, Iowa, Rock Island and Mercer Counties, Illinois. Cedar Valley has stipulated, directly or indirectly, that the units involved in decertification were "employees at Respondent's (Cedar Valley) facility in Waterloo, Iowa...." Exhibit R–7, p. 2–3.

In light of the above, the NLRB and the ALJ were justified in holding that "decertification of Union X does not decertify Union Y" where unions X and Y represent different bargaining units and are not united by a "community of interests." In this case, the NLRB and ALJ did not err in finding, pursuant to the "community of interests" analysis, that the Waterloo unions and the complaining unions were different bargaining units. Given the deference to which the NLRB is entitled in regards to the determination, this Court will not substitute its judgment for the NLRB's as to the appropriateness of the bargaining

units in Waterloo and the Quad City area. *See Electronic Data Sys. Corp. v. N.L.R.B.*, 938 F.2d 570, 572 (5th Cir.1991).

## B. EFFECTIVE TERMS OF THE QUAD CITY AGREEMENTS

In *Deklewa*, the NLRB stated that the obligations imposed by Section 8(f) agreements "are limited to prohibiting the unilateral repudiation of the agreement until it expires or until that employer's unit employees vote to reject or change their representative." *Deklewa*, 282 N.L.R.B. 184 at 1387. From this language, Cedar Valley argues that the Quad City Agreements of 1978 cannot be enforced by the complaining unions. Cedar Valley founds this argument on three grounds: (1) Pursuant to *Deklewa*, the Section 8(f) Quad City Agreements expired upon decertification of the Waterloo unions by Cedar Valley employees; (2) The lack of contact, or an ongoing relationship, between the complaining unions and Cedar Valley demonstrates that the Quad City Agreements had expired; and (3) Even assuming the Quad City Agreements were valid until April 30, 1989, between this expiration date and the signing of subsequent agreements between Operating Engineers 537, Laborers 309, and Associated Contractors, there was a time "gap" in which Cedar Valley repudiated any existing relationships with Operating Engineers 537 and Laborers 309.[6]

### 1) The Terms of the Agreements

Separate agreements existed between each of the complaining unions and Associated Contractors. While the complaining unions and Associated Contractors were the primary parties to these agreements, individual construction employers could also become bound by the terms of the agreements by signing the agreements. During the summer of 1978, Cedar Valley, a "non-member employer," signed the four agreements existing between the complaining unions and Associated Contractors.

---

**6.** This argument is inapplicable to the automatically renewed agreement Cement Masons 544.

*See supra* note 5.

The agreements signed by Cedar Valley existing between Operating Engineers 537, Laborers 309 and Associated Contractors bound Cedar Valley to "any amendments, extensions or changes in this Agreement agreed to between the Union and the Association, and further [bound Cedar Valley to] the terms and conditions of all subsequent contracts negotiated between the Union and the Association unless ninety (90) days prior to the expiration of this or any subsequent agreement said non-member employer notifies the union in writing that it revokes such authorization." *See* Exhibit GC–4, p. 28; Exhibit GC–6, p. 31. Pursuant to these agreements, if Associated Contractors, Operating Engineers 537 and Laborers 309 agreed to extend the effective term of the existing agreement (or enter into a new agreement with a new effective term), Cedar Valley would be bound absent an affirmative showing of timely written revocation of authority.

The agreement signed by Cedar Valley existing between Cement Masons 544 and Associated Contractors provided that "[t]his contract shall be in effect from May 1, 1978 to April 30, 1981 and shall automatically renew itself thereafter from year to year unless either party [7] hereto gives the other party no less than sixty (60) days notice by registered mail prior to the expiration date expressing their desire to modify, amend or terminate this contract." *See* Exhibit GC–9, p. 27. Pursuant to this agreement, if Cedar Valley failed to make an affirmative showing of timely written termination, the effective terms of the 1978 agreement with Cement Masons 544 would be extended on a year-to-year basis.

The agreement signed by Cedar Valley existing between Teamsters' 371 and Associated Contractors was similar to the those between Operating Engineers 537, Laborers 309 and Associated Contractors. The Teamsters' 371 agreement with Associated Contractors obligated employer signatories to subsequent agreements between the employer bargaining unit and the union. In essence, by signing this agreement Cedar Valley made Associated Contractors its bargaining representative with the authority to bind Cedar Valley to subsequent agreements. In the event that there were no new or modified agreements, the Teamsters' 371 agreement also bound Cedar Valley to the 1978 agreement as automatically renewed on a yearly basis. As with the other prehire agreements, the Teamsters' 371 agreement placed an affirmative obligation upon Cedar Valley to formally terminate its relationship with the union and Associated Contractors. Barring satisfactory formal termination, Cedar Valley would remain obligated to either additional agreements or the automatically renewed 1978 prehire agreement.

### 2) Analysis of Cedar Valley's Arguments

#### a) Decertification

■ In the previous section the Court found that the decertification of the Waterloo unions did not impact the relationship between Cedar Valley and the complaining unions. The Court finds that the viability and enforceability of the controlling agreements is in no way impaired by the decertification of the Waterloo unions. Therefore, this argument requires no more attention and the Court will focus on the two remaining arguments as to the validity of the Quad City Agreements.

#### b) The Lack of an Ongoing Relationship

■ Cedar Valley argues repeatedly in its brief that the lack of a continuous relationship between Cedar Valley and the complaining unions somehow cuts against the validity of the Quad City Agreements during 1989. The implicit reasoning behind this argument is that contractual obligations eventually expire if ignored, unused or unenforced. However, no authority supports such a conclusion. To the contrary, the ALJ, supported by substantial evidence, found that Cedar Valley was bound to the Quad City Agreements, either through automatic renewal or successive

---

7. By the terms of the agreements, Cedar Valley became an "additional signatory employer party to this Agreement."

agreements between the complaining unions and Associated Contractors, at the time in question.

The record supports the ALJ's finding that, as to Cement Masons 544, Cedar Valley "is bound by the automatic renewal language of its collective bargaining agreement...." Decision of the ALJ, p. 15. Nothing in the record supports a conclusion that Cedar Valley gave the Cement Masons 544 the formal notice of termination required by the 1978 Quad City Agreements. Don Hainline, a business agent for Cement Masons 544 testified that Cedar Valley had never terminated the agreement in writing. (Tr. 512). Cedar Valley, having signed an agreement that clearly obligated it to affirmatively and formally terminate the agreements with Cement Masons 544 at least sixty days prior to renewal, cannot fail to so terminate and then complain of enforcement.

The ALJ also found that Cedar Valley was bound to successive agreements between Associated Contractors, Operating Engineers 537 and Laborers 309 by virtue of the Quad City Agreements signed by Cedar Valley in 1978. Again, Cedar Valley argues that the lack of a continuing relationship between itself and the complaining unions makes the ALJ's finding tenuous. However, we find no link between periods of inactivity among the parties and the enforceability of the agreements. Rather, the decisive issue is whether Cedar Valley affirmatively, and in compliance with the terms of the 1978 agreements, revoked Associated Contractor's authority to bind it to successive agreements.

In holding against Cedar Valley, the NLRB also adopted the ALJ's finding that "Respondent (Cedar Valley) signed collective bargaining agreements with Operating

Engineers 537 and with Laborers 309, and each contract contained an express commitment to abide by the terms of successor association agreements. Respondent never terminated this delegation of bargaining rights in the contractually prescribed manner ... Respondent's obligation to be bound by successor agreements continued to the present." Decision of the ALJ, p. 14–15. The NLRB similarly adopted the ALJ's finding as to Cedar Valley's grant of bargaining authority found in the Teamsters' 371 1978 prehire agreement.[8] Decision of the ALJ, p. 15. Nothing in the record supports a conclusion contrary to the NLRB's or the ALJ's. There is no indication of, nor does Cedar Valley allege, formal termination or revocation by Cedar Valley of Associated Contractor's authority to bind it to successive agreements with Operating Engineers 537, Laborers 309 and Teamsters' 371. In light of Cedar Valley's failure to formally terminate these agreements, and based upon the substantial evidence before the Board, in the form of the agreements, the Court refuses to alter or reject the NLRB's Decision and Order. Accordingly, the Decision and Order will be enforced as to successive agreements reached between Associated Contractors, Operating Engineers 537, Teamsters' 371 and Laborers 309.

### c) The Time Gap Argument

■ In another tack to avoid the successive agreements between the Operating Engineers 537, Laborers 309 and Associated Contractor, Cedar Valley argues that no successor Association agreement had been executed during May 1989 to replace the previous contracts which expired on April 30, 1989.[9] Cedar Valley contends that in

---

**8.** The ALJ also found, in the alternative, that Cedar Valley was bound to the 1978 prehire agreement between Teamsters' 371 and Associated Contractors by virtue of the automatic renewal clause. Decision of the ALJ, p. 15.

**9.** Cedar Valley advances a similar argument against any successive agreements involving Teamsters' 371. Cedar Valley argues that Teamsters' 371 and Associated Contractors did not sign a new association contract until August 23, 1989, while the previous agreement expired on

April 30, 1989. This time "gap" argument is illusory. Cedar Valley ignores the fact that it was bound, without interruptions or gaps, to the 1978 agreement by virtue of automatic renewal absent timely notice of termination. There being no formal termination of this agreement, there was no time "gap" between valid association agreements. Further, as part of the 1978 prehire agreement signed by Cedar Valley, Associated Contractors was given authority to bind

the time "gap" between the expiration date of the 1978 agreements and the successor agreements between Associated Contractor, Operating Engineers 537 and Laborers 309, Cedar Valley repudiated its relationship with the complaining unions.

The NLRB concluded that "[t]he record shows, however, that there was, in fact, no 'gap.'" Based upon testimony from officers of Operating Engineers 537 and Laborers 309, the NLRB concluded that "new agreements were effective on the April 30, 1989, expiration of the old contracts. That these contracts may not have been formalized, printed, or mailed on May 1 does not make them any less binding for the purpose of finding a contractual continuum in this case. We conclude that there was no 'gap' during which the Respondent (Cedar Valley) could repudiate either of these agreements." Decision and Order of the NLRB, p. 3. Cedar Valley has argued various factual scenarios arguably supporting a conclusion contrary to the NLRB's. However, Cedar Valley has failed to show that the conclusion of the NLRB is not based upon substantial evidence. We find the testimony of the union officers to be substantial evidence supporting the NLRB's decision and are therefore compelled to affirm that decision.

### C. IS RETROACTIVE APPLICATION OF *DEKLEWA* MANIFESTLY UNJUST?

■ "In this circuit, we defer to the Board's conclusion to apply a decisional rule retroactively unless the result would be manifestly unjust." *Ryan Heating Co., Inc. v. N.L.R.B.*, 942 F.2d 1287, 1288–89 (8th Cir.1991) (citing *N.L.R.B. v. W.L. Miller Co.*, 871 F.2d 745, 748 & n. 2 (8th Cir.1989)). A manifestly unjust application of *Deklewa* is determined by posing three questions:

(1) whether the losing party relied on established Board policy when choosing the course of conduct that led to the unfair labor practices charge; (2) whether the Board abruptly changed that policy without clearly foreshadowing its in-

tent to do so; and (3) the severity of the penalty imposed on the losing party. *Ryan Heating*, 942 F.2d at 1289.

Cedar Valley contends that it repudiated the pre-hire agreements because (1) it "had every right to believe" that the decertification proceedings of the Waterloo unions terminated Cedar Valley's relationship with the complaining unions; and (2) that it could not have been aware that the Board would apply *Deklewa* so as to hold it liable under the 1978 Quad City Agreements. These arguments, however, fail to present "established Board policy," much less reliance on such policies. Cedar Valley has no where presented a clearly established policy of the NLRB leading to the conclusion that the decertification of one union necessarily implies the decertification of a sister union. Further, Cedar Valley could not have relied upon the Board's future application of *Deklewa* as an "established Board policy." Without showing reliance upon an "established Board policy," in necessarily follows that Cedar Valley cannot meet the second *Ryan Heating* factor of an unexpected, abrupt change in the relied upon established policy.

Having failed to meet the first two factors of *Ryan Heating*, the third factor, the severity of the penalty, loses any meaningful context in terms of manifest injustice. Without sufficient justification, Cedar Valley unilaterally repudiated viable agreements in 1989 in violation of *Deklewa*. This unilateral repudiation occurred despite the opportunity to formally terminate or repudiate prior to 1989. Within this factual context, we cannot say that the penalties imposed are so severe as to be manifestly unjust.

### D. ALLEGED DISINTEGRATION OF ASSOCIATED CONTRACTORS

■ Cedar Valley alleges that Associated Contractors suffered a complete breakdown or disintegration before the expiration of the Quad City Agreements on April 30, 1989, thus frustrating the purpose of these agreements and invalidating any suc-

Cedar Valley to any subsequent agreements

such as the agreement of August 23, 1989.

cessor agreements. "[T]he continued viability of the Association is a condition precedent to the enforcement of succeeding or renewed collective-bargaining agreements between the Association and the unions." Petitioner's Brief, p. 37. The NLRB, through the decision of the ALJ, held that "[n]eedless to say the fact that the number of employers who are members of the Association rises or falls or the fact that many members of the Association withhold bargaining authority from the Association is irrelevant." Decision of the ALJ, p. 15. Implicit within the NLRB's holding is the factual finding that Associated Contractors had not disintegrated or ceased to exist at the time of the 1989 successor agreements. The Board's finding as to the viability of Associated Contractors must be upheld if supported by substantial evidence. If so supported, the factual determination that Associated Contractors has not fragmented or disintegrated disposes of Cedar Valley's argument.[10]

The Court finds substantial evidence supporting the Board's conclusion that at no time did Associated Contractors cease to exist as an entity which could bind Cedar Valley. The record establishes that prior to the expiration of the 1978 Quad City Agreements, eleven of thirteen member employers of the association withdrew their bargaining rights from Associated Contractors. However, the record also contains substantial evidence supporting the conclusion that Associated Contractors was, at all times, an ongoing, viable organization. For example, Melvin Downs, field representative and vice-president of Laborer's Local 309, testified that since 1978, Local 309 has had a successive agreement with Associated Contractors. (Tr. 372).

Mr. Downs also testified that in spite of various member employers withdrawing

their bargaining rights from Associated Contractors there is a meaningful distinction between withdrawing bargaining rights and withdrawing membership entirely. (Tr. 439). Further, Mr. Downs indicated that some of the employers that withdrew bargaining rights from Associated Contractors did not withdraw as members. (Tr. 437). Harley Kittelson, president of McCarthy Improvement Company, an employer that withdrew its bargaining rights from Associated Contractors, testified without equivocation that McCarthy Improvement Company remained a member of Associated Contractors even after withdrawing its bargaining rights. (Tr. 294).

Jack Shadt, the business manager of Operating Engineers Local 537, testified that in 1989 the eleven employers that withdrew their bargaining rights signed an addendum to the Quad City prehire agreements between Associated Contractors and the complaining unions. (Tr. 267). Mr. Shadt stated that the group of employers that signed the addendum were "11 contractors, all members of the Rock Island Association (another name for Associated Contractors)." *Id.* (parenthetical added). Danny West, of Teamsters' 371, testified that the addendum served to modify the collective bargaining agreements of 1989 between the complaining unions and Associated Contractors. (Tr. 542). This addendum was signed by thirteen member employers of Associated Contractors, including members who had withdraw their bargaining rights. Clearly, had these employers fully withdrawn as members of Associated Contractors signing the addendum would have been a meaningless gesture.

In spite of these facts, Cedar Valley concludes that "[n]othing in the record disputes that the association effectively disintegrated and ceased to effectively exist pri-

---

**10.** The 1978 Quad City Agreements signed by Cedar Valley were pre-existing agreements between the complaining unions and Associated Employers. By the terms of these agreements, Cedar Valley became obligated to extensions or future agreements between the Association and the complaining unions by virtue of either automatic renewal or Cedar Valley's grant of authority to Associated Contractors to enter into extensions or modifications of the controlling agreements. The record amply supports the Board's

finding that Cedar Valley failed to formally terminate the 1978 agreements by the means required by the contracts. Therefore, Cedar Valley takes a different approach and attacks the viability of one of the parties to the original prehire agreements. This attack is predicated upon the assumption that Associated Contractors ceased to be a viable entity prior to April 30, 1989. Should this assumption prove false, Cedar Valley's attack must fail.

or to negotiating the 1989 agreements which are the basis for the Board's Order." Petitioner's Reply Brief, p. 14. However, in light of the above substantial evidence, this Court cannot overturn the Board's finding that Associated Contractors remained, at all relevant times, a viable organization able to bind Cedar Valley.

Cedar Valley also seeks to analogize this action to Section 8(a) cases dealing with fragmentation of multi-employer associations. However, the cases cited by Cedar Valley either cut against a finding that would release Cedar Valley from its contractual obligations or are inapplicable. Cedar Valley relies on *Charles D. Bonanno Linen Service v. N.L.R.B.*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), in an effort to claim that fragmentation of a multi-employer association justified Cedar Valley's abrogation of the agreements. However, *Bonanno* dealt with the question of whether fragmentation of a multi-employer association was a "unusual circumstance" justifying a single employer's withdrawal from ongoing employer-union negotiations. *Id.* at 412–17, 102 S.Ct. at 725–28. Further, the Court in *Bonanno* found that the interest in multi-employer unit stability is a major consideration in forcing an employer to bargain in compliance with collective bargaining agreements. *See also Action Elec., Inc. v. Local Union No. 292*, 856 F.2d 1062, 1065 (8th Cir.1988). In this case, allowing Cedar Valley to repudiate the contracts on the mere assumption that Associated Contractors had ceased to exist can only encourage instability in multi-employer units in the future. Cedar Valley's reliance on *Seattle Auto Glass v. N.L.R.B.*, 669 F.2d 1332, 1336–37 (9th Cir.1982), is also misplaced. As with *Bonanno, Seattle Auto Glass* dealt with the propriety of an employer withdrawing from a multi-employer unit during negotiations, not repudiation of finalized agreements.

Ultimately, the NLRB and the ALJ concluded that the size and composition of the association were irrelevant in light of Associated Contractor's continued viability and Cedar Valley failure to formally terminate the automatically renewed agreements or its grant of bargaining authority to Associated Contractors. Given the substantial

evidence supporting the Board's conclusion, this Court is bound to affirm the decision of the NLRB.

### E. THE 1978 AGREEMENT WITH TEAMSTER'S 371

 The last argument advanced by Cedar Valley is that the ALJ, and thus the Board, erred in finding Cedar Valley bound to the 1989 successor agreement between Associated Contractors and Teamsters' 371. In support of this argument, Cedar Valley alleges that the 1978 pre-hire agreement signed by Cedar Valley did not bind it to any successor agreements entered into by Associated Contractors. Instead, Cedar Valley alleges that, at most, it was bound to the automatic yearly renewal of the 1978 agreement. The NLRB, through the ALJ, found that "the language of delegation of bargaining rights in the Teamsters 371 contract is not as clear as that in Operating Engineers 537 and Laborers 309 agreements, nevertheless the delegation is the logical consequence of Respondent's contractual commitment to be part of the multi-employer bargaining unit." Decision of the ALJ, p. 15.

The conclusions of the ALJ and NLRB called for interpretation of the 1978 agreement between Teamsters' 371 and Associated Contractors. This interpretation of the controlling contract will be subjected to *de novo* review. *See Litton Fin. Printing v. N.L.R.B.*, ── U.S. ──, ──, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991). Upon an independent review of the record, the Court finds that the 1978 prehire agreement existing between Teamsters' 371 and Associated Contractors acted as a grant of bargaining authority to Associated Contractors to negotiate subsequent agreements binding Cedar Valley.

"In interpreting a labor contract, 'traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.' " *D.E.W., Inc. v. Local 93, Laborers' Int'l of North America*, 957 F.2d 196, 199 (5th Cir.1992) (quoting *United Paperworkers Int'l Union, AFL–CIO, CLC v. Champion Int'l Corp.*, 908 F.2d 1252, 1255–56 (5th Cir.1990) (citations omitted)). The traditional rules governing contract interpreta-

tion in this jurisdiction state that if the contract is unambiguous, then interpretation is a matter of effectuating the underlying intent of the parties "as garnered from the four corners of the document." *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir.1984); *see also Atkins v. Hartford Cas. Ins. Co.*, 801 F.2d 346 (8th Cir.1986). Whether a contract is ambiguous is a function of "the whole instrument and the natural and ordinary meaning of the language." *Press Mach. Corp.*, 727 F.2d at 784. Based upon the whole instrument and the language contained therein, the Court finds the 1978 Teamsters agreement unambiguously binds Cedar Valley to successor agreements negotiated by Associated Contractors.

The Preamble of the agreement defines the fundamental goal of the 1978 agreement as unity between multiple employers bargaining with the union. The agreement seeks to avoid the problem of "numerous separate labor agreements with differing standards of wages, hours and working conditions [which] in turn, would prevent contractors from competing for available work on the basis of like labor costs and would create inequities and inequalities among employees doing the same type of work in the same area." Exhibit GC–9, p. 1. The agreement avoids this problem by allowing employers to bargain as a single unit.

The Recognition Clause in the 1978 agreement is the means by which the "single bargaining unit" concept stated in the Preamble is actualized.

> The Conference (Teamsters) recognizes the Association as the bargaining agent for all Employers who have so authorized the Association for all work covered hereunder ... Individual Employers who have not so authorized the Association shall, by becoming party to this agreement also become part of said multi-employer bargaining unit, and withdrawal therefrom may be accomplished only by written notice to the Conference (Teamsters), at least sixty (60), but no more than ninety (90) days prior to the date of expiration of this agreement or of any renewal period hereof (parenthetical added).

Exhibit GC–9, p. 2. Given the agreement's underlying theme of bargaining unity, the Court finds that the Recognition Clause is reasonably susceptible to only one interpretation: That any employer who signs the agreement "become[s] part of said multi-employer bargaining unit (Associated Contractors)" which, for the sake of employer unity, is capable of binding the signatory employer. Any other interpretation would render the primary purpose of the agreement inert.

Upon *de novo* review, the Court finds that the 1978 Teamsters agreement binds Cedar Valley to successor agreements negotiated by Associated Contractors. Accordingly, the Court finds that the decision of the NLRB as to the interpretation of the Teamsters agreement and that decision will be enforced.

## IV. CONCLUSION

The Court finds that the Board's Decision and Order correctly applied the controlling law and is supported by substantial evidence. Therefore, the Decision and Order is AFFIRMED and this Court orders that it be enforced.