82 F.3d 1074
 152 L.R.R.M. (BNA) 2242, 317 U.S.App.D.C. 270,
131 Lab.Cas. P 11,560
 CHARLOTTE AMPHITHEATER CORPORATION d/b/a Blockbuster
Pavilion, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Alliance of Theatrical Stage Employees and
Moving Picture Machine Operators, Local 332,
AFL-CIO, Intervenor.
 No. 94-1494.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 5, 1995.
Decided April 30, 1996.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Ralph J. Zatzkis, New Orleans, LA, argued the cause and filed the briefs for petitioner.
 Vincent J. Falvo, Jr., Attorney, National Labor Relations Board ("NLRB"), with whom Linda R. Sher, Acting Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, were on the brief, argued the cause for respondent. Paul J. Spielberg, Deputy Assistant General Counsel, NLRB, entered an appearance.
 Joel A. Smith, Washington, DC, filed the brief for intervenor.
 Before BUCKLEY, GINSBURG and TATEL, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 Charlotte Amphitheater Corporation d/b/a Blockbuster Pavilion ("Blockbuster" or "Company") seeks review of an order of a National Labor Relations Board ("Board") finding that the Company committed unfair labor practices in the course of an organizational campaign by International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators, Local 322 ("Union"). The Board issued an order requiring the Company to cease and desist all unfair labor practices, to make whole and offer employment to some twenty named individuals, and to bargain with the Union. We uphold the Board's unfair labor practice findings; but because the Board failed to provide the requisite explanation for its bargaining order, we remand that part of the remedy for further consideration by the Board.
 
 I. BACKGROUND
 A. Factual Context
 
 2
 The Company opened an outdoor entertainment pavilion in Charlotte, North Carolina, on July 4, 1991. In the course of a season that now runs from April to November, the Company employs stagehands to unload and load equipment used in stage events, to perform carpentry, electrical and rigging work, and to operate lighting and sound equipment during performances. Before each show, the Company's crew chief assembles a team of workers from a roster of stagehands that it establishes at the beginning of each season.
 
 
 3
 Soon after the pavilion opened, the Union initiated a campaign to organize Blockbuster's stagehands. It did so openly and sought the Company's voluntary recognition. During the ensuing months, the Company's crew chief withheld work from pro-Union stagehands and made statements that the Company would burn down the pavilion rather than come to terms with the Union. A number of other acts by Blockbuster representatives during the remainder of the 1991 season were later cited by the Union as unfair labor practices.
 
 
 4
 By August 28, 1991, the Union had collected authorization cards from 44 of the 71 stagehands who had worked two or more shows at the pavilion. It filed a petition for a certification election with the Board, but withdrew it in the belief that the Company would voluntarily recognize the Union. At an October 4 meeting between Blockbuster and Union officials, however, the Company declined to do so; and on October 16, the Union filed a second petition for a certification election. The 1991 season ended in November, before an election could be held.
 
 
 5
 The Company began to recruit stagehands for the 1992 season the following February. On February 26, it held a meeting to accept job applications, which was attended by some 20 to 25 stagehands from the previous season. The Company's general manager advised them that the meeting was only for individuals who had not previously worked for Blockbuster. On February 28, Blockbuster sent postcards to all stagehands who had worked previously for the Company informing them that they were required to attend an organizational meeting on the morning of March 3. There were, however, two large and highly publicized stage events in the Charlotte area that day; and most of the experienced stagehands were employed at one or the other of these events. As a consequence, only about a half dozen of the 1991 stagehands were able to attend the meeting. The Company closed the application process for its former stagehands immediately after the March 3 meeting. During the 1992 season, Blockbuster's representatives again engaged in conduct that the Union would later describe as unfair labor practices.
 
 B. Board Proceedings
 
 6
 The Union filed charges against Blockbuster with the Board, alleging that the Company had engaged in numerous unfair labor practices in the course of the 1991 and 1992 seasons. An administrative law judge ("ALJ") held hearings in late 1992 and rendered his decision on April 28, 1993. He concluded that the Company had threatened, coercively interrogated, and withdrawn work opportunities from Union supporters and had refused to recognize and bargain with the Union, in violation of sections 8(a)(1), (3) and (5) of the National Labor Relations Act ("NLRA" or "Act"). Charlotte Amphitheater Corporation d/b/a Blockbuster Pavilion, 314 N.L.R.B. 129, 134-37, 144, 1994 WL 286300 (1994) ("Decision and Order"). These sections of the Act provide in relevant part:
 
 
 7
 (a) It shall be an unfair labor practice for an employer--
 
 
 8
 (1) to interfere with, restrain, or coerce employees [in the selection of the bargaining representative], ...
 
 
 9
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...(5) to refuse to bargain collectively with the representatives of his employees ...
 
 
 10
 29 U.S.C. §§ 158(a)(1), (3) and (5) (1994).
 
 
 11
 In particular, the ALJ found that the 1992 hiring process was designed to exclude stagehands who had worked the previous season. Decision and Order, 314 N.L.R.B. at 140-41. The ALJ identified 20 stagehands who had sought employment with the Company in 1992 but were denied places on the work roster as the result of their Union activities during the previous season. Id. at 141. The ALJ recommended that the Company be ordered to cease and desist from the unfair labor practices, to post notices, to make the 20 stagehands whole, and to recognize and bargain with the Union. Id. at 145.
 
 
 12
 On July 14, 1993, the Company filed a motion requesting the Board to reopen the record in order to enable it to introduce evidence that 13 of the 20 stagehands who had been discriminated against had been placed on the 1993 roster. Id. at 129. The basis for the Company's motion was that the imposition of the bargaining order was no longer warranted because the presence of these 13 employees on the roster ensured that a fair election could now be held. Id. On June 27, 1994, the Board issued its decision rejecting the motion to reopen the record and adopting the ALJ's findings, conclusions, and recommended order with only minor modifications. Id.
 
 II. DISCUSSION
 
 13
 In petitioning for review of the Board's Decision and Order, Blockbuster challenges a number of its findings and asks us to set aside the order that it bargain with the Union. We have carefully considered the Company's objections to the Board's findings of unfair labor practices and its conclusion that, in 1991, the Union was supported by a majority of the members of the relevant bargaining unit; and we reject those arguments as unpersuasive. Accordingly, we will focus our discussion on the Company's challenge to the bargaining order.
 
 
 14
 We begin our analysis by acknowledging that we owe deference to the Board's choice of remedy. See NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969) ("In fashioning its remedies under the [NLRA], the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts."). Over the past two decades, however, we have emphasized and reemphasized that a bargaining order is "an 'extraordinary remedy' that is not 'automatically entitled to enforcement.' " Avecor, Inc. v. NLRB, 931 F.2d 924, 934 (D.C.Cir.1991) (quoting NLRB v. Ship Shape Maintenance Co., 474 F.2d 434, 442-43 (D.C.Cir.1972)). See also Crown Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1142 (D.C.Cir.1994); Caterair Int'l v. NLRB, 22 F.3d 1114, 1123 (D.C.Cir.1994); Sullivan Industries v. NLRB, 957 F.2d 890, 903-05 (D.C.Cir.1992).
 
 
 15
 Our nation's labor policy is based on the right of employees "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing ... and ... the right to refrain from any or all of such activities...." 29 U.S.C. § 157 ("section 7"). Employees exercise these rights through secret elections that are conducted under the supervision of the Board. Id. § 159(c). Courts have recognized, however, that an employer may have engaged in a pattern of anti-union activities that has "so intimidated employees that an election, even with the full complement of traditional NLRB remedies, would not reflect their true sentiments." Avecor, 931 F.2d at 935. In such a case, the Board may dispense with an election and order an employer to bargain with a union that has had the support of a majority of its employees.
 
 
 16
 The Supreme Court has identified two types of employer misconduct that may warrant the imposition of a bargaining order: "outrageous and pervasive unfair labor practices" ("category I") and "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" ("category II"). Gissel, 395 U.S. at 613-14, 89 S.Ct. at 1939-40. While a bargaining order may be imposed in order to deter employer misconduct, the Court emphasized that in a category II case, "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." Id. at 614, 89 S.Ct. at 1940. See also NLRB v. Village IX, Inc., 723 F.2d 1360, 1370 (7th Cir.1983) ("to give employees a collective bargaining representative that they do not want, as a way of punishing their employer for committing unfair labor practices, is ... discordant with the basic philosophy of the Act").
 
 
 17
 The Board found that this case fell within category II. See Decision and Order, 314 N.L.R.B. at 143. In such a situation, the Board may order the employer to bargain with a union that had secured authorization cards from a majority of a bargaining unit's employees if it finds it unlikely that an election would reflect the employees' true sentiments. The underlying rationale is that the employees' wishes are better gauged by an old card majority than by a new election.
 
 
 18
 Circumstances, however, may change during the interval between the occurrence of the employer's unfair labor practices and the Board's disposition of a case. There is, therefore, the obvious danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a union. Therefore, we have repeatedly instructed the Board to determine the appropriateness of a Gissel bargaining order in light of the circumstances existing at the time it is entered. See, e.g., Avecor, 931 F.2d at 936-37; Pedro's, Inc. v. NLRB, 652 F.2d 1005, 1012 (D.C.Cir.1981); Peoples Gas System, Inc. v. NLRB, 629 F.2d 35, 45-46 n. 18 (D.C.Cir.1980); Ship Shape Maintenance, 474 F.2d at 443. Nor is this the whim of just one circuit; all but one of those that have considered the issue agree that changed circumstances, such as the passage of time or turnover in the work force, are relevant to the Board's decision to issue a bargaining order. See NLRB v. Cell Agricultural Mfg. Co., 41 F.3d 389, 398 (8th Cir.1994) (citing cases in the 1st, 3rd, 4th, 5th, 6th, 7th, 11th, and D.C. Circuits that have so held). But see NLRB v. Bakers of Paris, 929 F.2d 1427, 1448 (9th Cir.1991).
 
 
 19
 Moreover, we have insisted, and we continue to insist, that "[b]efore we will enforce a category II order, we must find that substantial evidence supports three findings," among them the finding that
 
 
 20
 the possibility of erasing the effects of past practices and of insuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order.
 
 
 21
 Avecor, 931 F.2d at 934 (quoting St. Francis Fed'n of Nurses & Health Professionals v. NLRB, 729 F.2d 844, 854-55 (D.C.Cir.1984). We have also emphasized that that finding must be supported by a reasoned explanation that will enable the reviewing court
 
 
 22
 to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive of employees' rights, are not adequate.
 
 
 23
 Peoples Gas System, 629 F.2d at 46. See also Somerset Welding & Steel, Inc. v. NLRB, 987 F.2d 777, 781 (D.C.Cir.1993) (declining to enforce bargaining order where "no reasoned justification therefor appear[ed] in the Board's order"). We therefore turn to the Board's Decision and Order to determine whether it has satisfied those requirements.
 
 
 24
 Because the Board has adopted the ALJ's recommendation of a bargaining order, Decision and Order, 314 N.L.R.B. at 130, we begin by examining the latter's reasons for his recommendation:
 
 
 25
 Considering all the foregoing [unfair labor practices], including, in particular, the fact that Respondent practically replaced the 1991 stagehand crew lock, stock, and barrel in 1992, I conclude the possibility of erasing the effect of Respondent's unfair labor practices and ensuring a fair election by use of traditional remedies is slight. Accordingly, I conclude that employee sentiment expressed through authorization cards would be better protected by issuance of a bargaining order in this case.
 
 
 26
 Id. at 143-44 (emphasis added). We are puzzled by the ALJ's use of the verb "conclude." He seems to assume that one can conclude that a bargaining order is appropriate simply by reciting the employer's unfair labor practices and commenting on their gravity. But to conclude that a bargaining order is appropriate presumes some preceding explanation as to why the traditional remedies will not suffice. We have searched the ALJ's decision but have found no explanation of why a fair election would not be possible once the Company has been required to post notices and reinstate the improperly discharged employees with back pay.
 
 
 27
 In adopting the ALJ's findings, the Board elaborates on the asserted need for a bargaining order. It begins on an unpromising note:
 
 
 28
 The Board continues to adhere to the view that the determination whether a Gissel bargaining order is warranted in a given case should be made on an evaluation of the circumstances at the time the unfair labor practices were committed.
 
 
 29
 314 N.L.R.B. at 129. We have repeatedly called the Board to task for its intransigent refusal to accept and act upon our instructions that the appropriateness of a bargaining order must be assessed as of the time it is issued. See, e.g., Avecor, 931 F.2d at 936-37; Pedro's, Inc., 652 F.2d at 1012. Nor have we been alone. See Cell Agricultural, 41 F.3d at 397-98 ("For over two decades, the Board has maintained a running feud with the courts of appeals regarding whether changed circumstances after an employer's unlawful conduct, such as employee turnover or the passage of time, which tend to erode majority support for a union, are relevant to the Board's decision to impose a bargaining order."); J.L.M., Inc. v. NLRB, 31 F.3d 79, 84 (2d Cir.1994) ("Despite our repeated pronouncements that we consider turnover a relevant consideration militating against the issuance of a bargaining order, turnover has been conspicuously absent from the Board's analysis in these types of cases.").
 
 
 30
 Given the changes in its own membership, it may well be that the Board is devoid of an institutional memory; but this court is not. Perhaps it believes it can wear us down; after more than twenty years, it should have learned that it cannot. As a consequence of its stubborn refusal to accept the holdings of virtually every circuit that has considered the matter, it has squandered a vast amount of our time as well as its own and has caused delays in the ultimate resolution of cases that cannot be laid at the feet of recalcitrant employers. If the Board continues to disagree with us, it is of course free to seek Supreme Court review.
 
 
 31
 Because the Board concluded that subsequent events are not relevant to the determination of whether a bargaining order is warranted, it denied the Company's motion to introduce evidence that it had placed on its active work roster 13 of the 20 stagehands improperly denied employment in 1992. The Board stated:
 
 
 32
 [E]vidence of the employment of discriminatees subsequent to the unfair labor practice hearing, such as that proffered by the Respondent, is not relevant to a determination of the propriety of issuing a bargaining order. In any event, even assuming the accuracy and relevance of the proffer, we find no reason for vacating the bargaining order. The violations committed by the Respondent were numerous, serious, and affected a large number of employees, as the [ALJ] correctly noted. That the Respondent has placed a number of discriminatees on its 1993 work roster will not necessarily reassure all the employees exposed to the Respondent's strong expressions of animus, including threats of closure, that they would risk nothing in supporting the Union in any renewed organizing campaign. Further, the asserted fact that the Respondent offered employment in 1993 to employees who were discriminated against in 1992, without making them whole for the period of discrimination, is hardly an assurance to those employees that they can engage in protected activity without suffering adverse consequences.
 
 
 33
 314 N.L.R.B. at 129-30.
 
 
 34
 We begin by addressing the Company's claim that the Board improperly denied the Company's motion to reopen the record. Although the Board has no affirmative duty to inquire whether employee turnover or the passage of time has attenuated the effects of earlier unfair labor practices, see Conair Corp. v. NLRB, 721 F.2d 1355, 1388-89 n. 1 (D.C.Cir.1983) (Wald, J., dissenting), an employer must be allowed the opportunity to introduce evidence of changed circumstances that would mitigate the need for a bargaining order. Because Blockbuster moved to reopen the record with reasonable promptness following the issuance of the ALJ's recommendation of a bargaining order, the Board's denial of the motion might have provided grounds enough for a remand. In the second sentence quoted above, however, the Board assumed the accuracy and relevance of the proffered evidence and took it into consideration in its ruling. We therefore reject this challenge and address the sufficiency of the Board's justification of the bargaining order.
 
 
 35
 We do not question that the Company's unfair labor practices were numerous and serious; nor do we doubt that the mere reinstatement of the discriminatees might be insufficient to erase the effects of Blockbuster's anti-Union actions. The Board, however, has given no indication that it has taken the employees' section 7 rights into consideration. Nor has it explained why the requirement that the Company reinstate the unlawfully discharged employees with back pay, when combined with the other traditional remedies at its disposal, are not enough to mitigate the effects of Blockbuster's actions.
 
 
 36
 Counsel for the Board offered such a reason in his appellate brief and at oral argument. He argued that being placed on the work roster is no guarantee that a crew chief will actually call the stagehand and offer him work. The stagehand will, in other words, still depend on the crew chief's good favor, which he may lose by supporting the Union. Under such circumstances, counsel contended, even the hint of a crew chief's disapproval of the Union will stifle Union activities and interfere with a fair election. While there may be merit to this argument, it is not to be found in the Board's decision. In a petition for enforcement, a court may consider only the Board's own reasons, not the rationalizations of counsel. SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462-63, 87 L.Ed. 626 (1943); see also NLRB v. Special Mine Services, Inc., 11 F.3d 88, 90 (7th Cir.1993) ("Tough nuts must be cracked open before the court swallows."). Thus the Board's justification falls short of its obligation to clearly articulate why a bargaining order is needed in addition to the other remedies it awarded.
 
 III. CONCLUSION
 
 37
 We affirm the Board's substantive conclusions and enforce the Board's remedial order insofar as it requires the Company to cease and desist all unfair labor practices, to post notices, and to make whole and offer employment to the individuals named in the Decision and Order. Nevertheless, in order to ensure that a bargaining order is issued only in those exceptional circumstances that warrant it, we insist that the Board adequately explain its need in each case, taking into consideration the employees' section 7 right to freedom of choice. The Board having failed in this obligation, we remand the case to the Board to consider whether the use of its traditional remedies would be adequate to ensure a fair election. Furthermore, if the Board is still inclined to issue a bargaining order, the order must be justified as of the time of its issuance. The Board is instructed to allow Blockbuster to proffer any evidence that the passage of time or a change in circumstances might mitigate the need for one.
 
 Accordingly, the Board's decision is
 
 38
 Enforced in part and remanded in part.